UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PEOPLE OF THE STATE OF
MICHIGAN,

    Plaintiff,

v

ORBIT MARKETING, LLC d/b/a CLIMAX
SOLAR; JOSHUA THOMPSON;  ENIUM
CAPITAL GROUP, LLC; SUNLIGHT
FINANCIAL, LLC; CROSS RIVER BANK;
TRIBEAM CAPITAL, LLC d/b/a CONCERT
FINANCE; REGIONS BANK d/b/a
ENERBANK USA; SOLAR MOSAIC, LLC;
SUNNOVA ENERGY INTERNATIONAL,
INC; and HARBORSTONE CREDIT UNION,

    Defendants.

No. 1:26-cv-02084

HON.

MAG.

---

Jeffrey D. Mapes (P70509)
Jacob M. Satin (P80149)
Assistant Attorneys General
Attorneys for Plaintiff
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI  48909
(517) 335-7632
MapesJ1@michigan.gov
SatinJ1@michigan.gov

    /

**COMPLAINT**

**I. INTRODUCTION**

1.    This case concerns a seller-arranged solar-finance scheme that turned

in-home sales pitches into long-term consumer debt. Climax Solar promised

homeowners a simple tradeoff: replace electric bills with predictable solar payments and save money. Instead, many consumers signed lender-linked documents during rushed in-home visits; the finance company funded Climax on paper milestones; Climax moved on; and consumers were left with inoperable systems, no permission to operate, property damage, ongoing utility bills, and long-term debt.

2.      The pattern was consistent: **Pitch, Sign, Fund, Fail, Collect.** Climax pitched bill elimination, tax credits, prompt installation, and low-risk financing. It then controlled the signing process on company devices and rushed consumers through installation and finance documents. The Finance Defendants funded Climax through lender-controlled portals and milestone processes before true completion, interconnection, or utility permission to operate (PTO). Many systems then stalled, failed, underperformed, lacked PTO, or were abandoned. Yet the Finance Defendants continued servicing, collecting, reporting, assigning, or enforcing obligations despite notice of seller misconduct, nonperformance, signature disputes, or cancellation defects.

3.      The Finance Defendants were not passive lenders. They built contractor-facing finance programs that relied on contractors like Climax to generate, process, and close consumer loans. Climax identified borrowers, collected personal and financial information, submitted applications through lender portals, presented lender-approved terms and forms, obtained electronic signatures, and treated approval and funding authorization as the practical closing. In substance,

2

Climax served as the Finance Defendants' sales, application, and closing channel for the credit products from which they profited.

4.      This Complaint addresses the People's quasi-sovereign and public interests, the integrated solar-finance model, Climax's standardized misrepresentations, the rushed electronic contracting process, statutory cancellation-right violations, post-sale failures, and finance-side conduct that keeps consumers tied to disputed obligations.

5.      Known lender and related-channel data show the scale. Records produced to date identify 1,689 Climax-originated Michigan loans totaling about $81.26 million in financed purchase amounts. Those loans included about $22.14 million in hidden finance charges--dealer fees, platform fees, or similar charges embedded in the financed price rather than separately disclosed. The average financed purchase price was about $48,113.72, and the average hidden finance charge was about 27.24 percent.

| Finance channel / lender | Loans | Amount Financed | Hidden Finance Charges | Avg. Purchase Price | Avg. Hidden Finance Charge |
|---|---|---|---|---|---|
| Sunlight | 233 | $12,535,543.90 | $3,572,271.08 | $53,800.62 | 28.50% |
| Cross River Bank (via Sunlight) | 259 | $12,588,132.36 | $4,003,957.17 | $48,602.83 | 31.81% |
| Mosaic | 200 | $8,390,874.46 | $2,756,385.82 | $62,940.66 | 32.85% |
| EnerBank (via Concert) | 305 | $14,725,288.00 | $3,650,398.90 | $48,279.63 | 24.79% |
| Enium | 548 | $26,945,520.37 | $6,582,282.56 | $49,170.66 | 24.43% |
| Sunnova | 57 | $2,261,960.31 | $777,323.85 | $39,683.51 | 34.37% |
| Community First | 9 | $273,911.72 | $54,403.95 | $30,434.64 | 19.86% |
| Dividend* | 78 | $3,542,849.07 | $738,491.20 | $45,421.14 | 20.84% |

| Total | 1,689 | $81,264,080.19 | $22,135,514.53 | $48,113.72 | 27.24% |

*\* Dividend is included for scale and comparison only. Dividend is not a defendant in this matter; the State is pursuing Dividend-related relief through separate multidistrict litigation.*

6.      Plaintiff seeks relief against Climax, Thompson, and the Finance Defendants because complete relief requires addressing both sides of the transaction: seller-side deception that induced consumers to sign, and finance-side origination, funding, servicing, collection, reporting, and enforcement practices that keep consumers bound to unlawful or failed transactions.

7.      The injuries are statewide. Defendants' practices harmed not only Climax customers, but also Michigan households, the residential-solar and solar-financing markets, and public confidence in legitimate solar offerings.

8.      The Attorney General brings this action on behalf of the People in sovereign and parens patriae capacities - not as a nominal stand-in for private litigants, but to redress broader harm to Michigan residents' economic well-being, the integrity of Michigan's residential-solar and seller-arranged-financing markets, and public confidence in lawful solar offerings.

## II. JURISDICTION AND VENUE

9.      This action seeks to stop unfair, deceptive, and abusive practices in in-home solar sales and the seller-arranged financing used to fund those sales, and to obtain complete relief for Michigan consumers whose transactions were induced by deception, affected by statutory cancellation defects, or never completed as promised.

10.    This is a public-enforcement action. It does not seek certification of a Rule 23 damages class. To the extent Plaintiff seeks restitutionary, rescissionary, reformation, cancellation, or account-level relief for affected consumers, it does so as ancillary public relief necessary to redress broader statewide injury, stop ongoing unlawful practices, and restore the honest functioning of Michigan's residential-solar and seller-arranged-financing markets.

11.    This Court has subject-matter jurisdiction under 28 U.S.C. Section 1331 because the Complaint asserts claims under federal law, including the Consumer Financial Protection Act, 12 U.S.C. Sections 5531, 5536, and 5552.

12.    The Court has supplemental jurisdiction under 28 U.S.C. Section 1367(a) over the State law claims because they arise from the same core conduct, transactions, and course of dealing as the federal claims and form part of the same case or controversy.

13.    This Court has personal jurisdiction over Defendants because they purposefully directed conduct at Michigan consumers; entered into, arranged, purchased, funded, serviced, held, collected, reported, assigned, or enforced consumer obligations tied to Michigan home-solicitation solar transactions; participated in Michigan dealer programs; and otherwise transacted business in Michigan related to the acts and practices challenged in this Complaint.

14.    Venue is proper in the Western District of Michigan under 28 U.S.C. Section 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including in-home sales presentations,

electronic contract execution, solar installations, servicing activity, payment collection, complaint handling, and conduct by Climax from Michigan business locations.

15.    Venue is also proper to the extent the Complaint asserts CFPA claims because federal law permits a state attorney general to bring CFPA claims in a United States district court located in the state bringing the action.

16.    Before filing this action, the Attorney General provided the Consumer Financial Protection Bureau with the notice and materials required by 12 U.S.C. Section 5552(b) and 12 C.F.R. Part 1082.

## III. PARTIES AND DEFINITIONS

17.    Plaintiff, the People of the State of Michigan, by and through the Attorney General, brings this action in the public interest and in sovereign and parens patriae capacities to restrain unlawful practices, obtain declaratory and injunctive relief, secure restitution and rescissionary relief, obtain civil penalties where authorized, and obtain all other remedies available by law. The Attorney General does not sue as a nominal stand-in for a collection of private plaintiffs. This constitutional Officer with statutory authorization sues to remedy broader injury to the economic well-being of Michigan residents, the integrity of Michigan's residential-solar and seller-arranged-financing markets, and public confidence in legitimate solar offerings and other renewable-energy options.

18.    Defendant Orbit Marketing, LLC d/b/a Climax Solar ("Climax") is a Michigan limited liability company that maintained business operations in Portage,

6

Michigan. After the conversion of its Chapter 11 bankruptcy proceeding to a Chapter 7 proceeding, *In re: Orbit Marketing, LLC, No. 24-01123* (Bankr. W.D.Mich), it is named through its bankruptcy trustee Kelly M. Hagan.

19.  Defendant Joshua Thompson ("Thompson") is an individual who resides in Climax, Michigan. At all relevant times Thompson, owned, managed, directed, controlled, had authority to control, or directly participated in Climax. Thompson is sued for his own acts and practices and for acts and practices he directed, controlled, authorized, knew of, ratified, or recklessly disregarded.

20.  Defendant Enium Capital Group, LLC ("Enium") is a Utah limited liability company with its primary place of business at 1064 W. North Country Blvd., Pleasant Grove, Utah 84062.

21.  Defendant Sunlight Financial, LLC ("Sunlight") is a Delaware limited liability company with its principal place of business at 601 12th St., Ste. 325, Oakland, California 94607.

22.  Defendant Cross River Bank ("CRB") is a New Jersey state-chartered bank with a principal place of business at 2115 Linwood Avenue, Fort Lee, New Jersey 07024.

23.  Defendant TriBeam Capital, LLC d/b/a Concert Finance ("Concert") is a Utah limited liability company with a principal place of business at 136 S. Main St., Ste. 400, Salt Lake City, UT 84101.

24.  Defendant Regions Bank is an Alabama state-chartered bank with its principal place of business at 1900 Fifth Avenue North, Birmingham, Alabama

7

35203. By merger, it is the successor of EnerBank USA ("EnerBank"), whose conduct is at issue here. All references to EnerBank apply to Regions Bank as EnerBank's successor by merger.

26. Defendant Solar Mosaic LLC d/b/a Mosaic ("Mosaic") is a Delaware limited liability company with its principal place of business at 601 12th Street, Suite 325, Oakland, California 94607. After the September 2025 approval and confirmation of the Plan in the Chapter 11 bankruptcy proceeding, *In re: Mosaic Sustainable Finance Corp., No. 25-90156* (Bankr. S.D. Tex), it is named through its bankruptcy Plan Administrator, Olive Advisors, LLC.

26. Defendant Sunnova Energy International Inc. ("Sunnova") is a Delaware corporation with its principal place of business at 20 East Greenway Plaza, Suite 540, Houston, Texas 77046. After the November 2025 approval and confirmation of the Plan in the Chapter 11 bankruptcy proceeding, *In re: Sunnova Energy International Inc., No. 25-90160* (Bankr. S.D. Tex.), it is named through Thomas A. Pitta, as trustee of the Sunnova Creditor Trust.

27. Defendant Harborstone Credit Union is a Washington state-chartered credit union with its principal place of business at 9611 Gravelly Lake Drive SW, Lakewood, Washington 98499. By merger, it is the successor of Community 1st Credit Union d/b/a Generations, a Division of Community 1st Credit Union ("Community First"), whose conduct is at issue here. All references to Community First or Generations apply to Harborstone Credit Union as Community First's successor by merger.

8

28.    Enium, Sunlight, CRB, Concert, EnerBank, Mosaic, Sunnova, and Community First are referred to collectively as the "Finance Defendants." The People use that term as an umbrella only. The Finance Defendants did not all play the same role. Sunlight, Enium, Concert, Mosaic, and Sunnova are alleged primarily as program, platform, channel-partner, or account-control defendants because they approved Climax, supplied portals, controlled forms or workflows, set program rules, routed complaints, charged or enabled dealer fees or platform fees, retained chargeback or remediation rights, or maintained records needed to identify account-control entities.

29.    CRB, EnerBank, and Community First are alleged as original lender, holder, or funding defendants based on documents showing their role in originating, funding, approving, purchasing, holding, servicing, collecting, reporting, or controlling Climax-related obligations.

30.    The People do not presently know the complete current ownership and servicing chain for every Climax-originated obligation. Certain obligations were sold, assigned, securitized, transferred, or placed into trust or investment structures after origination. The precise current owner, holder, trustee, servicer, credit-reporting furnisher, payment recipient, and UCC/security-interest holder for each obligation is within Defendants' possession, custody, or control and will be determined through discovery.

31.    The People do not seek at this stage to bind unknown nonparty holders directly, but seek discovery, account-control identification, and relief requiring

named Defendants to provide or cause relief to the full extent of their ownership, servicing, contractual, repurchase, chargeback, indemnity, trustee-direction, credit-reporting, lien-release, or remediation rights. Plaintiff reserves the right to add additional holders, trustees, servicers, or assignees if necessary to obtain complete relief.

32.    The Finance Defendants are covered persons under the CFPA to the extent they offered, provided, extended, brokered, serviced, purchased, held, collected, reported, assigned, or enforced consumer financial products or services, including consumer credit or loan-servicing activity. Plaintiff also pleads, in the alternative, that any Finance Defendant not acting directly as a covered person knowingly or recklessly provided substantial assistance to covered persons or service providers engaged in unlawful conduct.

33.    Climax and Thompson are liable under the CFPA only for conduct connected to consumer financial products or services, including arranging, brokering, facilitating, originating, materially assisting, or providing material services in connection with the Finance Defendants' consumer-credit programs. To the extent any seller-of-goods limitation is asserted, it does not bar claims based on Climax's and Thompson's conduct as service providers, arrangers, credit facilitators, or substantial-assistance participants in the offering or provision of consumer financial products or services.

34.    That finance-related conduct was not incidental to a solar sale. Climax sales personnel collected consumer identity, credit, utility, and project information

for use in lender systems; submitted applications through lender portals; selected or presented lender-approved products; obtained electronic signatures on lender-required documents; uploaded funding packages; transmitted completion information; and triggered disbursement review. Those services were material to the Finance Defendants' offering and provision of consumer-credit products.

35.     The defendants named in this action can provide or cause substantial relief because they designed, operated, funded, administered, or controlled the finance channels Climax used, or because they originated, funded, purchased, held, serviced, reported, assigned, enforced, or retained contractual rights over affected obligations.

36.     To the extent any affected obligation has been transferred, assigned, securitized, or placed into a trust or other investment vehicle, Plaintiff seeks relief requiring each named Defendant to identify the current account-control entities and to exercise all available servicing, repurchase, indemnity, chargeback, trustee-direction, account-correction, credit-reporting, lien-release, and remediation rights necessary to provide or cause effective consumer relief.

37.     Plaintiff brings this action pursuant to police and regulatory authority. To the extent any Defendant contends that a bankruptcy stay, discharge, plan injunction, claims-channeling provision, wind-down structure, or trust-governance document limits particular monetary relief against estate or trust property, Plaintiff will seek that relief only in the manner permitted by the Bankruptcy Code, applicable plans, and bankruptcy court orders. Nothing in this Complaint seeks to

11

bypass those limits, but those limits do not bar prospective, declaratory, injunctive, record-preservation, account-identification, or other public-enforcement relief to the extent permitted by law.

38.     The Finance Defendants are not named merely to enforce private contract language or vicarious liability; they are named because of their own conduct and because complete relief requires addressing the finance-side consequences of the challenged transactions.

## IV. THE PEOPLE'S QUASI-SOVEREIGN AND PUBLIC INTERESTS

39.     Michigan has a quasi-sovereign and public interest in protecting the economic well-being of its residents, preserving honest consumer markets, preventing deception in home-solicitation sales and seller-arranged financing, and ensuring that residential solar in Michigan develops through lawful competition rather than fraud, hidden pricing, and abandonment.

40.     Defendants' conduct injured those interests. Michigan households were sold long-term obligations through repeatable, lender-linked sales practices that promised immediate savings and affordable financing, yet often resulted in inflated prices, hidden financing costs, dual loan and utility payments, non-operational systems, property damage, and prolonged nonresponse.

41.     Defendants' conduct also injured the integrity of Michigan's residential-solar and solar-financing markets. By steering consumers into seller-arranged financing, embedding hidden finance-driven price inflation in system prices, suppressing meaningful comparison shopping, and using milestone funding

that rewarded speed over lawful completion, Defendants distorted competition in favor of deceptive practices and away from honest providers and transparent financing alternatives.

42. Residential solar depends on consumer trust. When a Michigan seller and its finance partners use deceptive sales, nontransparent pricing, and milestone funding that rewards paper completion over lawful operation, the resulting complaints and bad publicity predictably deter other Michigan residents from pursuing legitimate solar opportunities from reputable providers. That loss of trust injures the public interest in fair access to cleaner-energy products and services through lawful competition.

43. The harm alleged here reaches a sufficiently substantial segment of Michigan residents to support parens patriae relief. Records produced to date identify 1,689 Climax-originated Michigan accounts across multiple finance channels and the practices alleged here were not confined to a few one-off disputes. They arose from repeatable scripts, lender portals, standardized paperwork, and funding rules used across Michigan.

44. The direct injuries to identified borrowers, together with the indirect effects on market prices, competition, and consumer confidence, create a statewide controversy separate from the private interests of any one borrower.

45. Plaintiff therefore does not sue as a nominal stand-in for private litigants. It seeks broader public relief to stop ongoing unlawful practices, restore

13

honest market conditions, and remedy injury to Michigan's economy and market integrity.

46.    Private suits, even if brought, could not provide the same forward-looking market relief or fully address the systemwide servicing, reporting, assignment, and enforcement consequences of these transactions.

## V. THE INTEGRATED RESIDENTIAL SOLAR-FINANCE MODEL

### A. One Transaction: Solar Sale Plus Seller-Arranged Financing

47.    Residential solar is not typically sold like an ordinary cash retail transaction. Consumers often do not separately negotiate the product, independently shop for financing, and pay only after the product is complete and working. Instead, solar sellers commonly use an integrated point-of-sale model in which the seller markets the system, arranges financing, controls the paperwork, and obtains staged funding before the system is fully operational.

48.    Climax operated through that integrated model. It sold residential solar systems and, during the same in-home appointment, directed consumers into long-term financing – often for 20 to 25 years – through lender-controlled portals and forms.

49.    For consumers, the solar purchase and financing were presented and executed as one bundled transaction. Climax sales representatives controlled the laptop or tablet, entered the consumer's information, generated the proposal, selected or presented financing, and obtained signatures on installation and finance documents during the same visit.

14

50.     The financing was central to the sale. Climax framed the transaction as a monthly-payment decision: the homeowner would stop or reduce utility payments and replace them with a predictable solar payment. That framing kept the focus on a monthly number rather than the full system price, the total repayment obligation, the embedded cost of financing, or the risk that utility bills would continue.

51.     In practice, Climax functioned as the Finance Defendants' front end. It generated leads, collected personal and financial information, submitted applications through lender systems, obtained electronic signatures, uploaded documents, and treated approval and funding eligibility as part of closing the sale.

## B. Lender Training, Rules, Portals, and Control

52.     The Finance Defendants did not merely wire funds after the fact. They built contractor-facing programs that depended on dealers like Climax to market financing, originate applications, and deliver loan volume.

53.     The Finance Defendants controlled important parts of that system. They required training or onboarding before sales personnel could access portals, required use of lender-approved documents and workflows, dictated funding packages and milestones, reviewed or restricted marketing and promotional materials, and retained the power to suspend or terminate dealer access.

54.     These controls positioned the Finance Defendants to know what consumers were being told. Climax's principal testified that every lender trained the sales team, that some lenders required training before providing logins, that

15

lender representatives attended sales meetings, that contracts were submitted to lenders in every deal, and that lenders had to approve or review key consumer-facing documents.

55.    The same controls also gave the Finance Defendants practical leverage. They could deny applications, restrict products, freeze funding, impose chargebacks, require complaint reporting, terminate dealer access, and decide how to handle accounts after disputes arose.

### C. Hidden Dealer Fees and Finance-Driven Price Inflation

56.    The Finance Defendants' loan programs did not simply finance the price of Climax's solar systems. They helped create that price. The low advertised interest rates and low monthly payments were made possible by large upfront charges that the Finance Defendants called dealer fees, platform fees, original issue discounts, buydowns, or similar names.

57.    Whatever label was used, the charge worked the same way: the salesperson would inflate the price of the system by the amount of the dealer fee, the consumer borrowed the money, the Finance Defendant deducted or retained the fee from the loan proceeds, and Climax received only the remaining net amount.

58.    These charges functioned as finance charges and credit costs. They were not equipment, labor, permitting, interconnection, or installation costs. They were imposed because the consumer used the Finance Defendants' credit products. In a comparable cash transaction, the consumer would not pay that charge.

16

Properly understood, the charge was part of the economics of obtaining lender-linked credit, not part of the solar value delivered to the consumer.

59.    The disclosures did the opposite. Consumers were shown a single "amount financed" or "total contract price" that made it appear that the entire financed amount was being paid to Climax for the solar system and related work. The dealer fee was not separately itemized in the solar proposal. It was not separately itemized in the installation contract. It was not disclosed as a finance charge in the loan disclosures. And it was not included in the annual percentage rate as part of the cost of credit.

60.    This presentation mattered. When a dealer fee is hidden inside the amount financed, the disclosure overstates the amount of credit actually provided for the solar project and understates the credit cost. It also produces an artificially low stated APR, because the disclosed APR treats the dealer fee as if it were part of the cash price of the goods and services rather than part of the cost of obtaining credit.

61.    The mechanics were simple but deceptive. For example, using the updated known average Climax loan data, a consumer could be shown a financed purchase price of approximately $48,113.72. But with an average hidden finance charge of 27.24%, approximately $13,105.69 of that amount represented financing economics rather than solar value.

**The Low-APR Illusion**

When the dealer fee is included as a finance charge, the true cost of credit rises.

| Stated APR | Monthly payment | APR if dealer fee is included | What changed |
|---|---|---|---|
| 1.49% | $200.36 | **4.44%** | $13,893.72 fee treated as finance charge |
| 1.99% | $212.35 | **5.02%** | $13,893.72 fee treated as finance charge |
| 2.99% | $237.59 | **6.18%** | $13,893.72 fee treated as finance charge |

**Illustrative assumptions:**
- Average financed purchase price: $50,157.82
- Average hidden finance charge: $13,893.72 (27.70%)
- Term: 25 years; level monthly payments; no balloon-payment effect included
- Customer-level APRs should be recalculated loan by loan.

62. Climax's own sales practices confirm why the nondisclosure was material. Climax offered different pricing depending on whether the consumer paid cash or used lender financing. The financed price was higher because it included the Finance Defendants' hidden fees. But consumers were not told that they were choosing between a lower cash price and a higher financed price. Nor were they told how much of the higher financed price was attributable to the Finance Defendants' fee.

63. Consumers could not discover the price difference from the documents they were given. The Finance Defendants controlled the loan portals, loan documents, approved forms, and program rules, and Climax salespeople were required to use lender-approved materials and lender-controlled processes. Those rules and processes forbade Climax from discussing the dealer fee with consumers, identifying it as a finance charge, itemizing it, or otherwise disclosing its existence, amount, or effect.

18

64.    This prevented meaningful comparison shopping. A consumer comparing Climax's financed proposal to a cash price, home-equity loan, credit-union loan, or other financing option would not know that the lender's "low APR" loan carried a large prepaid finance charge hidden in the principal. The consumer would see only the monthly payment and stated APR, not the true cost of obtaining that credit.



**How the Hidden Dealer Fee Worked**
The consumer signed one inflated loan, but the money split two ways.

**Consumer loan**
**Amount financed**
$48,113.72
**Presented as**
solar system price
**Dealer fee**
not separately disclosed

**Finance Defendant**
**Funds**
loan or program
**Deducts/retains**
dealer fee
**Advertises**
low stated APR

**Climax receives**
**Approx.**
$35,008.03
**Net proceeds**
for system, labor, install

**Hidden finance charge**
**Approx.**
$13,105.69
**Percent**
27.24%
**Character**
dealer/platform fee

Based on updated known lender and related channel data: $81,264,080.19 financed and $22,135,514.53 in hidden finance charges. Dividend included for scale; it is not a defendant in this action.

65.    The hidden-fee structure also made the advertised low APRs false and misleading because they omitted the largest credit cost: the upfront dealer fee. When that fee is treated as part of the cost of credit, the amount actually provided for solar value decreases, the credit cost increases, and the true APR rises. Using the same updated average Climax figures for illustration, a 25-year loan advertised at 1.99% APR would have a materially higher APR if the average 27.24% hidden finance charge were included as part of the cost of credit.

19

66.     Plaintiff does not rely on hidden dealer fees merely as a technical disclosure violation. The deceptive act was presenting consumers with a single solar price, a low advertised APR, and a low monthly payment while concealing that a substantial portion of the financed amount reflected lender-linked credit economics rather than solar equipment, labor, permitting, or installation value.

**The Misclassification**
The dealer fee was treated as part of the amount financed, when it should have been disclosed as a finance charge.

| What the consumer saw | Proper disclosure |
|---|---|
| **Amount financed**<br>$48,113.72 | **Amount financed**<br>$35,008.03 |
| **Finance charge**<br>interest only | **Finance charge**<br>interest + $13,105.69 dealer fee |
| **Dealer fee**<br>not shown | **Dealer fee**<br>disclosed as cost of credit |
| **APR**<br>artificially low | **APR**<br>recalculated higher |
| **Impression created**<br>Entire loan pays for solar equipment and installation | **Reality shown**<br>Part of the loan pays finance economics, not Climax |

Illustrative average reflects updated known lender and related channel data, including Community First and Dividend for scale.

67.     Across the known lender and related-channel data, the hidden finance charges totaled approximately $22.14 million on approximately $81.26 million in financed purchase amounts. That means more than one-quarter of the financed amount--approximately 27.24% on average--was hidden finance-charge economics embedded into the price consumers were told was for their solar systems.

### D. Milestone Funding: Paying Before Solar Works

68.     The Finance Defendants' funding rules paid Climax for putting panels on a roof, not for delivering a working solar system. They released major funds before the system was fully permitted, inspected, connected to the grid, approved by

20

the utility, and operating. These loan programs were front-loaded: lenders paid Climax 60% to 80% once panels were installed, then held back only the remaining balance until the system was operational.

69.    PTO means "permission to operate." It is the utility's approval to interconnect and energize the system on the grid. Without PTO, a homeowner may have panels installed on the roof but still lack a lawful, utility-approved, revenue-producing solar system.

70.    The distinction between physical installation and working solar was critical. A solar system is not complete merely because panels are attached to a roof. A functioning system requires correct design, proper installation, electrical inspection, utility approval, interconnection, monitoring, and permission to operate. Yet the funding programs treated "substantial completion," photo uploads, milestone packages, or other documentation as enough to trigger major payments, even though the consumer still did not have the solar product they were sold.

71.    This created an obvious incentive: install quickly, upload the paperwork, collect the payment, and move to the next job. Once Climax received most of the money, it had less reason to return, fix problems, finish electrical work, get permits, obtain PTO, correct failed inspections, or solve production issues. The model rewarded funding milestones, not working systems.

72.    That is what happened. Consumers reported panels that were installed but not connected, turned on, producing, permitted, inspected, or approved for PTO—while loan payments had started or lender funds had already been released.

In one Mosaic matter, the file says the "install complete form" was submitted early and final completion was submitted before PTO. In another, the borrower complained that Mosaic paid Climax before the job was done and the system remained incomplete months later.

73.    Former Climax personnel described the same problem. After installation, Climax spent little or nothing on follow-up service, often leaving systems unfinished or not working. They also reported installations without permits, missing interconnection applications, and finance companies that did not require meaningful proof of completion before funding

74.    The funding structure also encouraged false or premature completion submissions. Former personnel reported that Climax submitted false or premature completion materials to obtain lender funding, including representing that permits had been obtained when they had not, submitting completion documentation before true completion, and using photo evidence that did not prove completed work. In a report to the Michigan State Police, a former Climax employee alleged that Thompson used a stock internet photo as purported proof of installation to secure financing for his personal solar system.

75.    This harmed consumers in several ways. First, consumers began paying for solar systems that were not yet operational. Second, consumers continued paying full utility bills because the systems were not connected, not producing, or not credited by the utility. Third, consumers were trapped between the installer and the lender: the lender treated the loan as valid because Climax

22

had submitted milestone paperwork, while Climax delayed, ignored, or failed to complete the work.

76. Some harm went beyond delay. If a system is turned on before PTO, or before the utility sets up the account and meter for solar credits, the system may send power to the grid without the homeowner receiving credit. Worse, the meter may count that exported power as extra usage, causing the homeowner to pay for electricity their own system produced.

77. Evidence shows Thompson knew utilities required systems to stay off before approval, but still pushed employees to configure and turn on systems because Climax needed that status for final funding. In one documented DTE escalation, a customer's system was turned on before proper interconnection and meter setup, causing billing problems, a reported $4,500 utility balance from unauthorized backfeed, and weeks without power.

78. Milestone funding also weakened cancellation rights. The investigation has identified at least 118 cases where Climax installed systems within the three-business-day cancellation period. Early installation alone is not Plaintiff's only alleged violation of the Michigan Home Solicitation Sales Act ("HSSA"). The problem is that Climax combined early installation with unclear cancellation notices, rushed electronic contracts, milestone funding, termination-fee language, and uncertainty over who would remove equipment, repair roof damage, undo financing, or restore the property if the consumer canceled. That made the cooling-off period much less meaningful.

79.     In short, the Finance Defendants' milestone-funding rules were not neutral paperwork. They were part of the deal structure. By paying large amounts before PTO and reliable operation, the Finance Defendants helped create the cash-flow system that let Climax grow quickly while leaving consumers with unfinished, defective, unpermitted, unconnected, or non-working solar systems—and long-term loans for systems that did not work.

## VI. THOMPSON'S CONTROL, KNOWLEDGE, AND PERSONAL PARTICIPATION

80.     Joshua Thompson was the owner and controlling decisionmaker behind Climax. The misconduct alleged here was not merely the result of isolated rogue salespeople. It was the foreseeable product of a sales-driven company that Thompson built, managed, funded, staffed, and continued operating after notice of recurring consumer harm.

81.     Thompson controlled strategy, sales operations, lender relationships, staffing, cash management, project management resources, escalation response, and the operational priorities that determined whether consumers would receive functioning systems.

82.     Thompson also had experience with high-pressure, finance-linked consumer sales before Climax. That background bears on Thompson's knowledge, intent, and ability to recognize the risks of scripted pitches, third-party financing, rapid closings, and inadequate follow-through.

83.    Thompson placed high-risk individuals in leadership and training roles. He recruited or retained personnel with known histories of misrepresentation or credit-related misconduct to train and supervise a sales force whose job was to originate long-term consumer obligations. Those choices created predictable compliance risk in a business that required accuracy about utility billing, federal tax credits, loan terms, cancellation rights, technical feasibility, and project-completion status.

84.    Climax did not build real guardrails to manage those risks. Sales training focused on building proposals, filling out contracts, collecting financing information, and closing the deal. Salespeople were not meaningfully trained on consumer-protection law, cancellation rights, the limits of tax-credit claims, or how utility billing and PTO actually affect savings.

85.    Thompson's control extended to the finances that affected completion. Climax records and bankruptcy-related materials reflect poor accounting, insider transfers, commingling, and expenditures that diverted resources away from completion, remediation, service, and consumer support. Those financial practices made it less likely that Climax would finish projects, fix defects, or refund consumers when deals failed.

86.    Thompson also knew the sales process was generating complaints. He received or was positioned to receive complaints, lender escalations, employee reports, and operational data reflecting recurring false bill-savings claims, tax-credit misunderstandings, completion problems, disputed signatures, non-working

25

systems, and unresponsive service. Despite that notice, he left the same standardized pitch, same-day closing model, and finance-driven funding model in place.

## VII. FALSE AND DECEPTIVE SALES PRACTICES

### A. Standardized Quick-Close Training

87.    Climax trained sales personnel to sell, not to educate. The core sales process emphasized quick proposals, scripted objection handling, management turn calls, and same-visit closings rather than accurate consumer-specific analysis of technical feasibility, tariff rules, tax consequences, and financing risk.

88.    Salespeople were coached to maintain control of the appointment, keep the process moving, and use management calls to save deals that consumers were not ready to sign. The effect was to treat hesitation as an obstacle to overcome rather than a signal that the consumer needed more information, more time, or independent advice.

89.    The standardized process explains why the same misleading themes appear across consumer complaints: solar would eliminate or nearly eliminate bills; offset percentages equaled savings; the tax credit would function like money back; payments would remain affordable; installation would be prompt; Climax would handle everything; and the written documents simply implemented the deal the salesperson had described.

## B. Proposal Software and False Precision

90.     Climax reinforced the pitch with proposal software that generated precise-looking estimates of system size, production, offset percentages, utility-bill effects, and long-term savings. Those outputs appeared authoritative to consumers, but they depended on inputs and assumptions controlled by the salesperson.

91.     Sales personnel could change or rely on assumptions about usage, shading, export credits, utility escalation, orientation, site suitability, and other variables in ways that made solar appear more financially favorable than reality supported.

92.     Consumers could not meaningfully audit those assumptions during an in-home appointment. The salesperson controlled the device, moved through the proposal, and pressed for immediate signature while the consumer lacked the technical and utility-rate information necessary to verify the numbers.

93.     Climax also presented offset percentages as if they measured bill reduction. A production offset is not the same as a utility-bill offset. Actual bill reduction depends on consumption patterns, fixed charges, time-of-use or net-metering rules, import and export treatment, PTO timing, system uptime, and utility billing setup. Climax nevertheless used high offset numbers as a shorthand promise of savings.

## C. Bill-Elimination and Bill-Swap Claims

94.     Climax routinely framed solar as a bill swap: the homeowner would replace the electric bill with a solar payment and begin saving immediately.

27

Consumers report being told their electric bills would disappear, fall to a nominal amount, or be offset by credits from excess production.

95.    Those representations were materially misleading. Solar customers generally continue to receive utility bills and may continue to owe substantial charges depending on usage, fixed charges, import and export treatment, tariff rules, system performance, and PTO. Consumers who believed they were swapping one bill for another instead often paid the solar obligation while still paying the utility.

96.    Climax management knew the no-bill message was recurring and problematic. Yet the company continued using the same savings-centered pitch because it made long-term financing appear safe and affordable.

### D. Savings Percentages and Utility-Rate Assumptions

97.    Climax used savings percentages and long-run utility-rate escalation assumptions to make transactions appear beneficial even when the consumer's own proposal showed an immediate monthly increase. In one proposal, the consumer's existing utility bill was identified as $255.80 per month, while Climax represented that the estimated first-year monthly cost after solar would be $269.96 per month— an increase of $14.16 per month, not a savings.

98.    Despite that increase, the same proposal represented that the consumer would realize $68,863.92 in "estimated solar savings over 20 years." That figure was not generated by actual first-year savings. It depended on projecting the consumer's future utility bills forward using an assumed 3.40% annual utility-rate

escalation, thereby treating hypothetical future inflation as if it were present savings.

99.    This presentation was misleading because it converted speculative, long-term utility-rate assumptions into a concrete savings number. Consumers were shown a large projected savings figure even where the transaction increased their immediate monthly cost, and Climax did not reliably disclose that the claimed "savings" existed only because of assumed future utility-rate inflation, not because the solar payment was lower than the consumer's current utility bill.

### E. Tax Credit as Money Bank

100.    Climax routinely presented the federal solar tax credit as guaranteed money back, commonly describing it as "30 percent back" or as a reduction that made the transaction affordable.

101.    That presentation was materially misleading. The federal tax credit depended on the consumer's actual tax circumstances, timing, eligibility, tax liability, and ability to use the credit. It was not a guaranteed cash refund for every homeowner.

102.    This was especially harmful to consumers whose income was wholly or largely nontaxable, including consumers living on Social Security, VA disability benefits, or similar fixed-income benefits. Those consumers often had little or no federal tax liability against which to apply the credit, meaning they could not obtain the promised "30 percent back" even though Climax represented that they could and encouraged them to rely on it.

103.   The tax-credit representation was often built into the financing structure. Consumers were led to expect a low initial payment or manageable repayment structure premised on later receipt and remittance of the assumed credit. When the consumer did not receive the expected amount or could not use the credit at all, payments would increase substantially.

104.   By presenting the credit as near-certain money back while minimizing or omitting its contingencies, Climax made the loan appear cheaper, safer, and more affordable than it was.

## VIII. SIGNATURE PROCESS, SUPPRESSED TERMS, AND HSSA CANCELLATION RIGHTS

### A. Salesperson-Controlled Electronic Signing

105.   Climax used salesperson-controlled electronic workflows during the in-home appointment. The salesperson controlled the laptop or tablet, navigated the consumer through signature screens, and obtained electronic signatures on multiple document sets in one sitting.

106.   Consumers did not receive a paper copy at the appointment or have a meaningful opportunity to read the full installation contract, financing documents, disclaimers, cancellation forms, or risk-shifting provisions before signing.

107.   The process was especially problematic for older consumers, disabled consumers, and consumers with limited digital literacy. A disclosure may have existed somewhere in an electronic workflow, but it was not meaningfully presented when the consumer was deciding whether to sign.

30

### B. Written Terms Contradicted the Oral Pitch

108.   The written documents contained disclaimers, limitations, integration clauses, cancellation restrictions, and risk-shifting terms that contradicted or narrowed the oral sales pitch.

109.   The documents disclaimed guarantees of production, savings, and tax-credit eligibility while the pitch emphasized bill elimination, promised savings, and guaranteed or near-certain tax benefits. The documents placed site-condition and performance risks on the homeowner even when the salesperson had represented that Climax would handle everything.

110.   The documents also included termination-fee language, limitation-of-liability provisions, integration clauses, and procedural requirements that made it harder for consumers to enforce the oral promises that induced them to sign.

111.   Because the signing process was rushed and controlled by the salesperson, consumers were deprived of a fair opportunity to understand that the written terms shifted risks onto them and contradicted the sales pitch.

### C. HSSA Predicate Violations and Cancellation-Right Confusion

112.   Climax's in-home transactions were home solicitation sales under Michigan law because they involved sales of goods or services exceeding $25, were solicited at the buyer's residence, and resulted in the buyer's agreement or offer being given at or in connection with that residence.

113.   The HSSA required Climax to provide a compliant written agreement and clear notice of the buyer's right to cancel until midnight of the third business

31

day after the transaction. The notice had to tell consumers that cancellation was without penalty or obligation, that payments and negotiable instruments would be returned, that security interests arising from the transaction would be canceled, and that delivered goods would be made available at the residence or returned at the seller's expense and risk.

114. Climax failed to honor that statutory structure. It used salesperson-controlled electronic signing, obscured or minimized cancellation rights, used forms and terminology framed around early termination rather than statutory cancellation, imposed extra procedures not found in the statute, and paired cancellation language with termination-fee and expense language.

115. Those practices were deceptive and unlawful under the MCPA because they confused consumers about their legal rights, obligations, and remedies. They were especially deceptive when Climax rushed installation, project activity, milestone submissions, or funding before the cooling-off period expired. Once Climax altered the property, installed equipment, or triggered finance activity, consumers were left to believe that cancellation could expose them to removal costs, roof-repair costs, termination charges, financing consequences, or other burdens that the HSSA did not permit Climax to impose.

116. Because Climax failed to provide compliant HSSA notice, affected consumers retained an extended right to cancel by notifying the seller in any manner and by any means of their intent not to be bound. Because the seller arranged the credit as part of the same home-solicitation transaction, meaningful

32

cancellation relief must address the seller's tender and evidence-of-indebtedness obligations as well as finance-side collection, reporting, assignment, lien or security-interest, and account-status consequences that would otherwise nullify the statutory cancellation right.

## IX. POST-SALE FAILURES AND SYSTEMIC PROJECT MISMANAGEMENT

### A. Non-Operational Systems and Unresponsive Service

117.    After sales and financing were completed, consumers repeatedly reported that systems stalled, remained incomplete, lacked PTO, failed to operate, or produced less than promised while Climax failed to respond meaningfully to calls, texts, emails, lender inquiries, and complaints.

118.    Complaint logs repeatedly describe panels installed but not operational, no PTO, failed inspections, missing documents, unresolved interconnection issues, and consumers paying both the solar obligation and normal electric bills.

119.    Servicer notes also show consumers requesting cancellation, removal, or relief because the system did not work, only to be told that the installer had been paid or that repayment was not contingent on system performance.

### B. Permitting, Inspection, and Code-Compliance Failures

120.    Municipal records, utility correspondence, and witness statements reflect repeated permitting, inspection, and code-compliance breakdowns. These

failures delayed or prevented final approval, required rework, and undermined lawful operation.

121.    A former Climax electrical contractor reported that Climax submitted permit applications using his license information before he was licensed and without his review or authorization, and that required electrical supervision was missing on many jobs.

122.    These problems were foreseeable because Climax's model sold first and verified later. Site suitability, roof conditions, electrical capacity, code clearances, shading, and utility interconnection requirements were often not adequately resolved before consumers signed and financing moved forward.

### C. Premature Completion and Funding Submissions

123.    Because finance programs used completion or substantial-completion milestones as cash triggers, Climax had an incentive to submit completion materials before true completion. Consumers then became obligated on accounts tied to systems that were not yet permitted, interconnected, approved for PTO, or producing.

124.    The evidence includes allegations of early install-complete submissions, false or unsupported funding documentation, and completion certifications inconsistent with borrower complaints or utility records.

125.    Once funding occurred, Climax had less economic incentive and fewer resources to finish projects, fix defects, obtain PTO, or respond to complaints. That

structure shifted project-completion risk from Climax and the finance program onto consumers.

### D. Consumer Harm

126.   The foreseeable injuries included long-term debt for failed or disputed systems, continued utility bills, payment increases after tax-credit assumptions failed, property damage, roof leaks, missed work appointments, credit-reporting consequences, and the time and expense of seeking help from lenders, regulators, attorneys, utilities, and local permitting authorities.

127.   The repetition of these issues across consumer affidavits, Attorney General complaints, lender logs, BBB records, permitting records, and former-employee accounts shows systemic failure, not isolated customer misunderstanding.

### X. REPRESENTATIVE CONSUMER EXAMPLES

128.   The following examples are representative, not exhaustive. They illustrate how the same Pitch, Sign, Fund, Fail, and Collect mechanism affected Michigan consumers across lender programs and complaint channels.

129.   Steven S. of Vicksburg reported to the Michigan Attorney General that Climax's salesperson claimed the system would eliminate his electric bill except for a monthly service fee, would bank summer production for winter use, and would allow him to use solar power during outages. After signing, he learned the outage claim required a battery system, his system went down for months, Climax did not

respond without threats of legal action, and he remained concerned that bankruptcy or abandonment would leave him with both the loan and utility bills.

130.    Deloris W. of Detroit reported that Climax and its contractor failed to complete the solar connection and left her with utility payment problems and unresolved roof damage. She alleged that panels remained unconnected, her DTE bills and payment-plan issues continued, and roof work connected to the transaction caused leaking and debris problems.

131.    Jennifer E. of Burlington attested that a Climax sales representative promised a 38-panel system would produce approximately 91 percent of the household's electrical needs and reduce the electric bill to about $20 per month, while also assuring her that the loan payment would remain fixed. After installation, the project required additional work, the loan increased, panels were removed and reinstalled after roof damage, and the system was installed in a way that reduced expected production.

132.    Heidi and Zachary W. of Kalamazoo alleged that Climax promised premium panels, no electric bill, gas-bill offsets from excess production, a money-back production guarantee, a $2,000 rebate, and tax-credit benefits. They later alleged that the panels delivered and the warranties did not match the promises, the rebate was not paid, and the system did not perform as represented.

133.    Sunlight complaint logs include a borrower who reported that a solar-loan payment was taken even though the panels were not installed and working. Sunlight escalated to Climax for a service-upgrade and completion update, but its

36

own notes also stated that the first payment might come due before the panels were connected, leaving the borrower exposed to payment before a working system existed.

134.    Sunlight logs also include borrowers who sought cancellation or relief because Climax had gone missing, the system had not been activated, or the loan was blocking the sale of a home. In one such case, Sunlight recorded that Climax had been MIA, had missed meetings, and that Sunlight nevertheless would not cancel the loan.

135.    Mosaic loan records include a borrower who complained that installation was incomplete and that Climax repeatedly failed to appear for scheduled completion appointments. Mosaic records also include a borrower whose complaint summary stated that an install-complete form had been submitted early even though nothing was connected and the borrower was being billed for a system from which he received no benefit.

136.    Mosaic records also reflect sharper post-notice conduct. In one file, Mosaic affirmed fraud because photo proof showed that no panels had been installed at all, yet the borrower reported that Mosaic was still seeking payment and credit consequences before that result. In another, Mosaic told a borrower that the loan remained valid and owing, that cancellation required installer approval, and that the borrower should keep working with a third-party remediation contractor even though the project was still incomplete.

137.    Enium records include a borrower who said he did not agree to the loan payment, wanted the panels removed, and wanted roof repairs. Enium records also include a borrower whose panels had been on the home for six months but were still not active, while the installers were no longer taking calls.

138.    Enium records further include a borrower who received a statement but reported that he did not know who Enium was and had not applied for a loan, as well as borrowers who complained that electricians had not completed work, appointments were missed, communication failed, or they had to pay unrelated charges to avoid collections. The recurring lender-side response was to email Climax for an update, wait for a reply, and in some cases mark the file resolved, duplicate, or closed without real account relief.

139.    These examples show the same pattern: consumers were sold on savings, tax credits, fixed or affordable payments, prompt completion, and turnkey service; they were signed through a controlled electronic process; Climax or the finance program obtained funding or account activation; the project failed or remained disputed; and consumers were left to navigate payment demands, servicing responses, and unresolved installation problems.

## XI. WHY THE FINANCE DEFENDANTS, HOLDERS, SERVICERS, AND ACCOUNT-CONTROL ENTITIES ARE RESPONSIBLE FOR RELIEF

### A. Purpose of the Finance-Defendant Allegations

140.    The finance allegations are included for a specific reason: lenders did not merely happen to finance bad solar jobs. The finance programs were part of the

38

transaction from the beginning, made the sales possible, paid Climax before true completion, preserved the account value after disputes arose, and now control much of the relief consumers need.

141.   By the time consumers complained of unfinished projects, non-working systems, lack of PTO, disputed signatures, cancellation defects, or property damage, the related obligations had often already been approved, funded, serviced, sold, reported, or enforced. Seller-side relief alone would leave many consumers with the same account, the same credit-reporting consequences, the same security-interest or lien problems, and the same risk of collection.

142.   The relevant finance questions are therefore straightforward: what power did each Finance Defendant have over the transaction, how did it profit from the transaction, what notice did it receive, and what did it do with the account after it knew there was a problem.

## B. The Relevant Finance-Side Roles

143.   The finance side of the transaction involved multiple roles. The Program Defendants - Enium, Sunlight, Concert, Mosaic, and Sunnova - controlled the contractor-finance channels Climax used to solicit applications, present terms, obtain signatures, submit documents, route complaints, and trigger funding or customer-agreement activity. The Original Lender Defendants – CRB, EnerBank, and Community First - funded, originated, approved, purchased, held, serviced, collected, reported, or controlled documented obligations. Other current holders, servicers, assignees, trustees, UCC secured parties, credit-reporting furnishers,

39

payment recipients, and account-control entities are not fully known. Plaintiff seeks discovery to identify them and will seek joinder if they are necessary for complete relief. Plaintiff's claims and requested relief are directed to each defendant according to the role it played and the relief it can provide or cause.

### C. Same Transaction and Preserved Claims and Defenses

144.    The financed obligations arose from the same solar sale. Consumers did not separately shop for unrelated credit after an independent purchase decision. Climax sold the solar system and arranged the financing together during the same in-home process, using lender portals, lender forms, lender-approved workflows, and lender approval as part of the close.

145.    Because the credit obligation was tied to the seller transaction, consumer claims and defenses arising from seller misconduct, formation defects, HSSA cancellation rights, noncompletion, nonperformance, lack of PTO, or failure of consideration were not eliminated by assignment, servicing, or account transfer. The FTC Holder Rule and lender program documents preserved, recognized, or were consistent with those defenses.

146.    The FTC Holder Rule is relevant because it confirms that seller-related claims and defenses travel with the financed obligation. Plaintiff also seeks relief under the CFPA, the MCPA, including MCPA violations predicated on HSSA noncompliance, common law, and the Court's declaratory and equitable authority. The Finance Defendants are named for their own conduct in designing, pricing,

approving, funding, servicing, collecting, reporting, assigning, disputing, and enforcing these obligations.

147.    Plaintiff does not rely on the FTC Holder Rule as the sole source of affirmative relief against every Finance Defendant. The Holder Rule is one part of the relief framework, together with the Finance Defendants' own CFPA conduct, program documents, chargeback and repurchase rights, servicing conduct, assignment conduct, account-control authority, and the Court's equitable authority.

### D. Control Over the Finance Channels Climax Used

148.    The Finance Defendants controlled the channels Climax used to turn an in-home pitch into long-term debt. They approved Climax or its personnel for program participation, controlled loan products or customer-agreement terms, supplied or approved forms, required portal submissions, imposed training or onboarding requirements, set funding rules, and retained suspension, termination, chargeback, or remediation rights.

149.    That control matters because it made the Finance Defendants more than passive purchasers of paper. Their programs shaped how the transaction was presented, documented, funded, serviced, and enforced. The same controls also gave them tools to stop funding, reject defective submissions, require remediation, reverse payments, charge losses back to Climax, or protect consumers once complaints revealed systemic problems.

150.    The Finance Defendants did not always use identical documents or hold the same legal title in every transaction. The relevant point is functional: each

defendant used or benefited from a program in which Climax acted as the front-end sales and origination channel, and each retained program-level or account-level power over funding, documentation, servicing, collection, reporting, assignment, enforcement, or remediation. Boilerplate contract language disclaiming agency, joint venture, or independent-contractor status does not erase the practical control alleged here over forms, portals, funding, complaints, and remediation.

## E. Economics and Incentives

151.    The finance economics were material to the deception and the remedy. Dealer fees, platform fees, OID, buydowns, or equivalent charges inflated the financed price while allowing the transaction to be sold as a low monthly payment. Consumers were not shown a clear cash-versus-credit comparison or a separate line item identifying how much of the price reflected financing economics rather than solar value.

152.    Known lender and related-channel data show that Climax's practices affected at least 1,689 Michigan accounts and generated more than $22.14 million in hidden financing costs. Those fees inflated the prices consumers financed, increased their monthly obligations, and made the systems appear more affordable than they were.

153.    These economics also explain why a false bill-swap pitch was so powerful. Consumers were not merely induced to buy panels. They were induced to finance an inflated amount over decades based on promises that utility savings, tax credits, rebates, and stable payments would make the transaction affordable.

42

## F. Notice and Post-Notice Account Conduct

154.    The Finance Defendants received account-level and program-level notice that Climax-originated transactions were affected by seller misconduct, disputed signatures, cancellation defects, unfinished work, missing permits, lack of PTO, non-working systems, property damage, installer abandonment, and consumer inability to reach Climax.

155.    After receiving that notice, the Finance Defendants generally still controlled the account or had program, servicing, contractual, complaint, chargeback, repurchase, or remediation tools that could affect account relief. They also held or controlled records needed to identify payment processing, servicing, dispute handling, chargebacks, account status, credit reporting, assignment, enforcement, and the availability of meaningful relief. Consumers, by contrast, lacked access to lender-side funding files, dealer communications, milestone submissions, portal records, and program controls.

156.    The post-notice conduct is a separate basis for relief. Even if a Finance Defendant disputes what it knew at the kitchen table, it had later notice from complaints, escalations, servicing records, completion problems, PTO records, fraud reviews, or contractor abandonment. Continuing to collect, report, assign, enforce, or preserve account value after that notice caused additional consumer injury.

## G. Enium and Associated Enium-Channel Entities

157.    Control. Enium approved Climax into its financing program, retained the right to approve or deny applications, required Enium-approved sales contracts,

43

controlled marketing materials, limited financing-language disclosures in sales contracts, controlled portal access, and required complaint reporting and cooperation. The Enium agreement also defined a "Lender" as the legal entity providing funding for each loan and provided that underwriting standards could be established by Enium or any Lender in their discretion.

158.    Economics. Enium-channel records presently identify 548 Climax-originated Michigan loans totaling approximately $26.95 million in financed purchase amounts, with approximately $6.58 million in dealer fees or similar hidden finance charges. The combined Enium-channel average hidden finance charge was approximately 24.43 percent. Those economics made the low-payment, tax-credit, and bill-swap sales pitch materially more deceptive because consumers were not told how much of the obligation reflected financing structure rather than solar work.

159.    Notice. Enium received complaints that borrowers did not sign, did not know who Enium was, were tricked into signing, had unfinished or non-working systems, were paying before systems worked, or had projects lacking PTO or required completion evidence. Enium's own program documents required complaint reporting and cooperation, and its records reflect direct contact with Climax personnel about unresolved borrower complaints.

160.    Post-notice conduct. Even after notice, Enium often limited its response to emailing Climax for an update, requesting inspection or PTO information, or asking Climax to pay or fix the issue, while leaving the borrower on

44

the account. In multiple files the dealer failed to respond, complaints were marked resolved or treated as duplicates, and borrowers remained exposed to payment, UCC-1 issues, or unresolved system problems despite allegations that the system was not active, the borrower did not sign, or the borrower did not know who Enium was.

161.    To the extent Enium-channel records show that an account is owned, serviced, reported, assigned, enforced, or controlled by an entity beyond Enium itself, Plaintiff will seek joinder of any additional entity necessary for complete relief.

## H. Sunlight and Associated Sunlight-Channel Entities

162.    Control. Sunlight controlled loan products, rate sheets, credit standards, forms, documents, borrower-confirmation processes, refund and chargeback rights, contractor marketing rules, complaint reporting, and program access. Sunlight treated each borrower as the mutual customer of both Climax and Sunlight and required Climax to use Sunlight-provided or Sunlight-approved applications, loan documents, disclosures, and funding processes.

163.    Economics. Sunlight records identify approximately 492 Climax/Sunlight Michigan loans with about $25.1 million in balances and approximately $7.58 million in hidden finance charges, or roughly 30.2 percent of those balances. That hidden-fee structure allowed Climax and the lender program to sell low advertised rates while embedding substantial credit economics into the amount financed.

45

164.    Notice. Sunlight complaint records reflected non-working systems, missing PTO, disputed signatures, hidden payment problems, and borrowers being billed before systems worked. Sunlight internal materials described very poor loan performance, at least 22 PTO complaints, and willful misconduct, resulting in suspension of Climax in August 2023.

165.    Post-notice conduct. Even after notice, Sunlight often kept loans in place, routed borrowers back to Climax, or closed complaints without full relief. Its own notes show cases in which Sunlight told borrowers that the first payment might come due before the panels were connected, maintained that a loan could not be canceled even when Climax had been MIA and missed meetings, and continued asking Climax for PTO updates after borrowers reported unfinished or non-operational systems.

166.    Sunlight-channel records indicate that some Climax-originated obligations were originated, funded, purchased, held, serviced, reported, assigned, enforced, or controlled through entities or account structures beyond Sunlight and CRB. The current owner, holder, servicer, payment recipient, credit-reporting furnisher, UCC or security-interest holder, trustee, assignee, and account-control entity for each affected obligation will be determined through discovery. Plaintiff reserves the right to seek joinder of any additional entity necessary for complete relief.

46

### I.    Cross River Bank

167.    Control. CRB is named based on its role as bank lender in the Sunlight point-of-sale lending program. The Sunlight/CRB program documents show that CRB originated loans to finance residential solar systems and other home improvements; that Sunlight facilitated those loans through dealer agreements with installers and channel partners approved by CRB in writing; that CRB approved program terms, program guidelines, credit policy, underwriting requirements, notes, loan documents, and loan products; that Sunlight processed loan applications on CRB's behalf using CRB-approved forms; that CRB could reject any loan that did not comply with program terms or was otherwise unsatisfactory; and that CRB retained review, audit, testing, reporting, retained-loan, sale, securitization, and whole-loan-transfer rights. Those facts support direct liability and account-level relief independent of any formal agency label.

168.    Economics. Sunlight records identify CRB as original lender on approximately 259 Climax loans totaling about $12.59 million in financed purchase amounts. Those same records show approximately $4.00 million in hidden finance charges on CRB loans, an average hidden finance-charge burden of roughly 31.81 percent. Those charges were not solar equipment or installation labor; they were lender-linked financing economics embedded in the principal balance and paid by consumers over time.

169.    Notice. CRB's notice was not merely theoretical. Program documents gave CRB rights to receive reports, approve and modify program guidelines,

approve loan documents and products, supervise loan-application processing, review and audit loan applications, receive disbursement schedules identifying funding milestones and loan proceeds, test Sunlight's technical information and underlying data for compliance with credit, program, and compliance guidelines, and require independent validation of Sunlight's models. By August 2023, Sunlight identified very poor loan performance, at least 22 PTO complaints on jobs marked project complete, willful misconduct, and reports that Climax was pushing deals through even when they did not meet program criteria. CRB's program role, retained rights, and economic stake make those facts relevant to CRB-backed loans and post-notice enforcement.

170. Post-notice conduct. After notice of systemic Climax problems, CRB, directly or through Sunlight, servicers, assignees, purchasers, retained-loan structures, or CRB-backed account-control channels, continued to hold, sell, service, collect, report, assign, enforce, or benefit from CRB-backed Climax loans unless and until adequate account-level relief was provided. CRB is therefore a necessary party for complete relief on CRB-backed obligations to the extent of its origination, retention, sale, servicing, reporting, repurchase, indemnity, account-correction, lien-release, or remediation rights.

### J. Concert

171. Control. Concert is named based on TriBeam's role in the Concert/EnerBank channel. TriBeam described the relationship this way: CED Greentech was the sales partner responsible for initial onboarding, ongoing

48

monitoring, and sales; TriBeam was the technology provider responsible for the platform, application and loan-document processing, and disbursements; and EnerBank was the lender of record responsible for funding and servicing. The Climax contractor agreement likewise required Climax to use the Concert Portal managed by EnerBank's third-party technology provider to qualify and remain approved, upload required documentation, request the proper loan type, and request funding under established portal procedures. Those facts support Concert's role as a program and technology-channel defendant, not merely a remote vendor.

172.    Economics. The Concert/EnerBank data produced to the Attorney General identify 305 Climax loans, all listed with EnerBank as loan owner, a 1.49 percent rate, and a 24.79 percent dealer fee. The same data reflects approximately $14.73 million in amount financed and approximately $3.65 million in dealer-fee economics. The contractor agreement provided that a nonrefundable Loan Fee could be charged when loans closed, that the fee amount was available through the Concert Portal or other secure method, and that loan proceeds would be reduced by those fees before the Net Loan Proceeds were transmitted through the technology provider for distribution.

173.    Notice. The Concert/EnerBank program documents created direct notice and remediation channels. Climax had to provide prompt written notice to EnerBank and Sponsor of any customer complaint involving a loan, provide notice and cure defects in goods or services covered by warranties, comply with applicable law, use approved marketing materials, maintain required licenses and insurance,

49

ensure employees and authorized sales agents complied with program requirements, verify customer identity before funding, and avoid funding requests unless entitled to make them under the customer agreement and portal procedures. The same documents recognized Holder Rule claims and defenses, required EnerBank, Sponsor, and Climax to work together to try to resolve customer complaints, and allowed modification, reimbursement, or reduction of loan obligations where a Holder Rule loss existed.

174.  Post-notice conduct. Where complaints arose, the Concert/EnerBank structure supplied mechanisms to identify the account, review the loan file, evaluate the customer complaint, modify the loan, reimburse amounts paid, reduce or eliminate amounts owed, charge Holder Rule losses back to Climax, deduct repayment amounts from future net loan proceeds, suspend or terminate Climax's program participation, and preserve or produce portal, funding, and disbursement records. Plaintiff seeks relief from Concert to the extent Concert maintains, controls, processed, or can provide records or account-channel information necessary to identify affected accounts, funding submissions, disbursements, dealer fees, payment authorization forms, and available remediation rights.

## K. EnerBank

175.  Control. EnerBank was not merely a remote holder of paper. The Concert/EnerBank contractor agreement identified EnerBank as the lender/program participant, required Climax to complete training before marketing the loan program, required use of approved marketing materials, limited eligible

improvements to those authorized by the program, required portal documentation to qualify and remain approved, and allowed suspension or termination of program access. EnerBank also controlled or participated in loan descriptions, loan fees, disbursement rules, complaint procedures, and Holder Rule loss procedures.

176. Economics. Concert/EnerBank records identify approximately 305 Climax loans owned by EnerBank totaling about $14.73 million in amount financed. Those loans used a 24.79 percent dealer fee, implying approximately $3.65 million in dealer-fee economics. That pricing structure made the apparent low-rate loan materially different from the true cash cost of the solar system and supports relief for hidden finance-driven price inflation.

177. Notice. EnerBank had contractual and practical notice channels. Climax had to report customer complaints and defects; borrowers were directed to notify EnerBank about disputes or completion concerns; and program documents recognized that EnerBank, the sponsor, and the contractor would work together to resolve complaints and that EnerBank could modify, reduce, eliminate, or reimburse amounts in response to Holder Rule losses. EnerBank loan documents also tied disbursements to project milestones rather than true long-term performance, making false or premature milestone submissions directly material to EnerBank.

178. Post-notice conduct. EnerBank retained account and collateral remedies, including payment collection, credit reporting, UCC or security-interest rights, acceleration, repossession, disconnection, sale of collateral, assignment, and

51

default remedies. After notice of seller misconduct, completion disputes, or non-working systems, continued collection, reporting, assignment, enforcement, or preservation of account value caused separate injury. EnerBank is a necessary party for cancellation, suspension, reformation, refund, credit, credit-reporting correction, lien or UCC relief, and preserved claims and defenses on EnerBank-backed obligations.

### L. Mosaic

179.    Control. Mosaic ran a dealer-based financing program and controlled applications, finance products, marketing rules, training, portal-based origination, funding stages, post-sale documentation, holdbacks, and chargebacks.

180.    Economics. Mosaic records identify approximately 200 Michigan Climax loans, with dealer fees on nearly all of them and average dealer fees of approximately 33 percent of principal.

181.    Notice. Mosaic had notice of unfinished systems, non-working systems, unauthorized loans, missing panels, early completion submissions, and disputed installation or performance issues. Mosaic records show that only 51 of approximately 200 Michigan Climax/Mosaic loans had a recorded PTO milestone.

182.    Post-notice conduct. Mosaic often notified the installer, directed borrowers to work with Climax, or closed the case even when the installer was unresponsive. In some files Mosaic stated that the loan remained valid and owing, that cancellation required installer approval, or that the borrower should continue working with a third-party remediation contractor. In others, borrowers reported

52

that no work had been done or that no panels had been installed at all, yet Mosaic's process still depended first on dealer response rather than immediate account relief.

183. Mosaic-channel records also indicate that certain Climax-originated obligations were funded, originated, owned, held, or assigned through additional funding partners, assignees, or account-control entities. To the extent another Mosaic-channel entity owns, services, reports, collects, enforces, or controls account relief for affected obligations, that entity may be necessary for complete account-level relief. Plaintiff reserves the right to amend if records show Mosaic cannot provide or cause complete relief.

## M. Sunnova

184. Control. Sunnova appointed Climax as a sales and installation representative for Sunnova systems in Michigan. Sunnova trained Climax, controlled portal use, validation, milestone packages, notice to proceed, project progress, interconnection processes, inspections, service routing, and discipline or termination.

185. Economics. Sunnova records presently identify 57 financed Michigan Climax-originated obligations with approximately $777,000 in dealer fees on approximately $2.26 million in purchase price, or roughly 34 to 35 percent.

186. Notice. Sunnova's compliance materials applied to dealers and other marketing channels, prohibited deceptive conduct and poor disclosures, and stated that Sunnova would monitor dealers and take action when needed. Its complaint

records reflected incomplete or non-working systems, missing panels, unresponsive installers, and early install-complete submissions.

187.    Post-notice conduct. Sunnova often notified the installer, routed service through Climax, or narrowed the issue to installer follow-up while the obligation remained in place. Plaintiff seeks relief because Sunnova retained service, inspection, interconnection, and discipline tools but consumers still faced unresolved completion, performance, or installation problems. Plaintiff is also investigating whether a successor, related securitization entity, trustee, or other account-control entity currently controls servicing, account status, payment collection, customer communications, credit reporting, UCC/security-interest treatment, or cancellation/reformation authority for Sunnova-channel Climax obligations, and reserves the right to amend the Sunnova allegations and party designation to name the entity or entities with actual account-control authority.

### N. Community First

188.    Control. Upon information and belief, Community First accepted, approved, originated, funded, held, serviced, or collected brokered consumer solar loans through Generations, a Division of Community 1st Credit Union with Michigan consumers. Community First loan documents identify Generations as the lender division, require borrower ACH authorization to Community First, and include completion and funding instructions authorizing release of remaining loan proceeds after borrower signature. Those facts support Community First's role as an

original lender, holder, funding, servicing, and account-control defendant for Community First-backed obligations.

189. Economics. Community First/Generations records presently identify 9 Michigan consumer solar loans totaling approximately $273,911.72 in financed amounts. The Generations statements show approximately $54,403.95 in transfers labeled 'Final Pmt to Clean.Tech' or equivalent, averaging approximately 19.86 percent of the amount financed. Upon information and belief, those transfers represent hidden finance-charge economics or seller/lender-linked pricing embedded in the financed amount rather than properly disclosed as finance charges.

190. Notice. Upon information and belief, Community First had notice channels through its loan applications, underwriting, completion certificates, funding instructions, ACH authorizations, loan-account statements, customer-service records, and borrower complaints sufficient to know or discover whether Climax had completed the promised work, whether loan proceeds were paid to others through disguised final-payment charges, and whether consumers were left paying obligations tied to failed or disputed solar projects.

191. Post-notice conduct. Community First, directly or through Generations and any successor, holder, servicer, payment recipient, or account-control entity, continued or had the ability to continue servicing, collecting, reporting, assigning, enforcing, or preserving value in Community First-backed obligations unless and until account-level relief was provided. Community First is therefore a necessary party for discovery, cancellation, suspension, reformation, refund, credit, credit-

55

reporting correction, lien or security-interest release, and preserved claims and defenses on Community First-backed obligations.

## O. The Common Finance-Defendant Pattern

192. The common pattern across the Finance Defendants is control, economics, notice, and post-notice enforcement. Each used Climax as a front-end origination or channel partner; each benefited from embedded financing economics, transaction volume, interest, account value, servicing value, assignment proceeds, or collateral rights; each retained mechanisms for funding, chargebacks, complaints, servicing, reporting, assignment, enforcement, or account correction; and each had notice or access to notice that Climax projects were failing or disputed. These defendants are not sued merely because they later held or serviced paper generated by Climax.

193. Despite that notice, the Finance Defendants commonly left obligations active, routed consumers back to Climax, narrowed disputes to installer issues, continued billing or reporting, assigned or preserved account value, or otherwise treated accounts as enforceable even where the underlying sale was induced by deception, cancellation rights were defective, signatures were disputed, or systems were incomplete, non-operational, or not approved for PTO.

## XII. RELIEF FRAMEWORK

194. This is a public-enforcement action. Plaintiff seeks consumer-level relief only as ancillary public relief necessary to stop ongoing unlawful practices,

56

repair broader statewide injury, and restore the honest functioning of Michigan's residential-solar and seller-arranged-financing markets. This action does not seek Rule 23 certification or attempt to aggregate private damages claims that belong exclusively to individual litigants. The requested account-level relief is not the object of the action standing alone; it is the mechanism necessary to stop ongoing public harm caused by active collection, reporting, assignment, enforcement, lien, UCC, and account-control consequences flowing from the same unlawful statewide sales-finance system.

195.    Plaintiff seeks broad relief sufficient to stop the challenged practices and restore affected consumers as nearly as practicable to the position they would have occupied absent those practices. That relief includes, where appropriate, injunctive relief, restitution, rescissionary relief, cancellation or reformation, refunds or credits, account correction, credit-reporting correction, lien or security-interest release, disgorgement, civil penalties where authorized, and other equitable relief.

196.    For the CFPA claims, Plaintiff seeks the legal and equitable relief authorized by 12 U.S.C. Section 5565, including rescission or reformation, refunds, restitution, disgorgement or compensation for unjust enrichment, other monetary relief, public notification where appropriate, limits on Defendants' activities, costs, and civil money penalties.

197.    As to the Finance Defendants, relief should run to the full extent of each defendant's ownership, servicing, administrative, contractual, repurchase,

indemnity, chargeback, reporting, enforcement, assignment, or account-control rights. Where a named defendant no longer directly holds or services an affected obligation, Plaintiff seeks relief requiring that defendant to exercise available rights to provide or cause appropriate relief.

## XIII. COUNTS

198.    Counts I through V and Count VII are brought by the Attorney General on behalf of the People in sovereign, parens patriae, and public-enforcement capacities. They are not pleaded as Rule 23 class claims. Through those counts, Plaintiff seeks only the declaratory, injunctive, restitutionary, rescissionary, cancellation, reformation, disgorgement, and other equitable or statutory relief authorized by law and necessary to redress the broader injuries alleged above.

199.    Count VI is pleaded in the alternative only as an ancillary equitable theory supporting public enforcement and public redress. It is not presented as a standalone individualized damages claim or as an effort to aggregate tort recoveries belonging exclusively to private litigants.

200.    These Counts are organized by conduct and remedy. Counts I and II address the front-end sales-financing scheme and hidden finance-driven pricing. Count III addresses the Finance Defendants' post-notice servicing, collection, reporting, assignment, and enforcement conduct. Counts IV and V address Climax and Thompson's seller-side MCPA/HSSA and fraud violations. Count VI seeks alternative unjust-enrichment relief. Count VII seeks the account-level declaratory

58

and injunctive relief necessary to make any consumer remedy meaningful. The counts against the bank, holder, servicer, and account-control defendants are pleaded based on loan-specific origination, funding, hidden-fee economics, account control, preserved claims and defenses, and post-notice collection or enforcement conduct, not merely on the existence of a seller relationship.

## COUNT I

### Consumer Financial Protection Act - UDAAP: Integrated Origination and Sales-Financing Scheme
### 12 U.S.C. Sections 5531(a), (c), (d), 5536(a)(1)(B), 5536(a)(3), 5552
### (Against All Defendants)

201.    The Finance Defendants are covered persons under the CFPA because, at relevant times, they offered, provided, marketed, arranged, approved, funded, purchased, held, serviced, collected, reported, assigned, or enforced consumer-credit obligations used to finance Climax-originated residential solar transactions with Michigan consumers.

202.    Climax and Thompson acted as covered persons, service providers, and substantial-assistance participants by materially participating in the offering and provision of consumer financial products and services, including by presenting lender financing, collecting and transmitting consumer information, submitting applications through lender-controlled platforms, obtaining electronic signatures on lender-required documents, and using lender-linked workflows to close financed transactions.

203.    To the extent any Defendant was not itself a covered person or service provider for a particular transaction, that Defendant knowingly or recklessly provided substantial assistance to covered persons or service providers engaged in unfair, deceptive, or abusive acts or practices and is liable under 12 U.S.C. Section 5536(a)(3).

204.    Defendants engaged in deceptive acts and practices in connection with consumer financial products or services by making, using, approving, facilitating, reinforcing, funding, servicing, enforcing, or failing to correct material representations and omissions likely to mislead reasonable consumers, including representations and omissions that:

a.    solar would eliminate, nearly eliminate, or reliably replace the consumer's electric bill with a fixed solar payment, while minimizing continued utility charges, nighttime imports, fixed charges, tariff limits, export-credit limits, and PTO or interconnection delays;

b.    offset percentages, production simulations, and proposal outputs equated to guaranteed dollar savings or reliable bill reduction, even though those outcomes depended on assumptions consumers could not verify and that could be undermined by shading, redesigns, usage changes, tariff structure, and delayed or failed PTO;

c.    the federal solar tax credit functioned as automatic money back, a reliable discount, or a source of funds that could be counted on to make the

transaction affordable, while minimizing nonrefundability, tax-liability limits, timing, carry-forward issues, and re-amortization risk;

d.　projects would be promptly completed, interconnected, lawfully authorized, and producing power, while minimizing known and foreseeable causes of delay, including permitting failures, inspection failures, utility interconnection requirements, meter-programming issues, backlog, redesigns, and contractor nonresponsiveness;

e.　the transaction was a simple, affordable, low-risk bill swap, while concealing or minimizing finance-driven price inflation, embedded dealer fees or equivalent charges, re-amortization consequences, and the practical effect of signing long-term loan or customer-agreement documents during a salesperson-controlled in-home workflow;

f.　written documents merely implemented the oral deal, when the documents included disclaimers, limitations, cancellation restrictions, risk-shifting terms, and lender obligations that materially contradicted the sales presentation and were not meaningfully presented before signing; and

g.　a project was complete, substantially complete, or eligible for funding when material work remained, including permitting, inspection, utility interconnection, meter work, PTO, correction of defects, or actual system operation.

61

205.   Those representations and omissions were material because they concerned the central reasons consumers agreed to buy solar and assume long-term financing: expected monthly savings, total cost, affordability, tax-credit treatment, project completion, system operation, cancellation rights, and enforceability of the related financing obligation.

206.   Defendants engaged in unfair acts and practices by causing or being likely to cause substantial injury to consumers, including long-term debt on systems that were incomplete, delayed, defective, non-operational, unlawfully energized, lacking PTO, underperforming, or abandoned; continued utility bills in addition to solar payments; property damage; credit-related consequences; and loss of meaningful cancellation, dispute, and remediation rights.

207.   Consumers could not reasonably avoid those injuries because they were subjected to same-visit in-home closings, salesperson-controlled electronic contracting, lender-controlled portals and forms, complex technical and utility assumptions, nontransparent finance pricing, and post-sale funding and servicing processes they could not evaluate or control at the kitchen table.

208.   Those injuries were not outweighed by countervailing benefits to consumers or competition. The practices increased loan volume and contractor funding by shifting undisclosed risks and costs onto consumers and rewarding speed, funding, and paper completion over truthful disclosure, lawful completion, and system performance.

209.    Defendants' acts and practices were abusive because they materially interfered with consumers' ability to understand material terms and conditions of the consumer financial products and services and took unreasonable advantage of consumers' lack of understanding, inability to protect their interests, and reasonable reliance on Defendants and their agents to accurately present the integrated solar-and-financing transaction.

210.    As to each Finance Defendant, the conduct alleged above regarding the integrated finance model, hidden finance-driven pricing, milestone funding, program control, notice, and post-notice account conduct constitutes direct participation, substantial assistance, and, where applicable, post-notice continuation of the UDAAP practices alleged in this Count. As to Climax and Thompson, the conduct alleged above regarding Thompson's control, Climax's deceptive sales practices, salesperson-controlled electronic signing, HSSA cancellation-right misconduct, post-sale failures, and representative consumer examples constitutes direct participation and substantial assistance in those same UDAAP practices.

**COUNT II**
**Consumer Financial Protection Act - UDAAP: Hidden Dealer Fees**
**and Finance-Driven Price Inflation**
**12 U.S.C. Sections 5531, 5536(a)(1)(B), 5536(a)(3), 5552**
**(Against All Defendants)**

211.    Defendants' financing programs commonly imposed large loan-related charges referred to as dealer fees, platform fees, OID, buydowns, or equivalent financing charges. Those charges were built into the transaction price and financed

63

principal rather than transparently presented to consumers as the economic cost of obtaining lender-linked credit.

212. By embedding those charges into the purported system price and amount financed, Defendants increased the amount consumers borrowed, increased the total repayment obligation, obscured the true cash-versus-credit price difference, and impaired consumers' ability to compare lender financing against cash payment, bank financing, credit-union financing, or other credit options.

213. The practice was deceptive because consumers reasonably understood the financed system price to reflect solar equipment, labor, permitting, interconnection, and installation value, when a substantial portion reflected the economic price of lender-linked financing or monthly-payment buydown.

214. The practice was unfair because it caused or was likely to cause substantial monetary injury that consumers could not reasonably avoid and that was not outweighed by countervailing benefits. Consumers could not reasonably avoid the injury because the fee was not separately disclosed, was embedded in the price, and was presented through a sales process focused on low monthly payments and savings rather than total price or cash-credit comparison.

215. The practice was abusive because Defendants took unreasonable advantage of consumers' lack of understanding of embedded credit costs and of consumers' reasonable reliance on Climax and lender-controlled materials to accurately present the cost of the transaction.

216.   Each Finance Defendant participated directly in designing, approving, implementing, funding, purchasing, servicing, collecting, reporting, assigning, or enforcing loan programs that used embedded dealer-fee pricing and misleading cost-of-credit presentation. Climax and Thompson participated by steering consumers into those programs, presenting lender-linked prices and payments, transmitting applications and documents through lender systems, closing financed transactions in the home, and accepting funding based on prices inflated by the financing structure.

**COUNT III**
**Consumer Financial Protection Act - UDAAP: Post-Notice Servicing,**
**Collections, Reporting, and Dispute Handling**
**12 U.S.C. Sections 5531(a), (c), (d), 5536(a)(1)(B), 5552**
**(Against the Finance Defendants)**

217.   The Finance Defendants received repeated notice, at program and account levels, that Climax-originated transactions were affected by seller misconduct, nonperformance, formation defects, cancellation disputes, signature disputes, noncompletion, nonoperation, lack of permits, lack of PTO, property damage, installer abandonment, and contractor nonresponsiveness.

218.   Despite that notice, the Finance Defendants commonly treated obligations as continuing, collectible, reportable, assignable, or enforceable; routed consumers back to Climax; closed or narrowed disputes without meaningful relief; or required consumers to continue paying while the financed system remained incomplete, non-operational, not interconnected, or not approved to operate. To the extent a particular Finance Defendant did not itself service or hold a particular

account, it still possessed program records, complaint files, chargeback rights, repurchase rights, dealer-control rights, or other contractual tools relevant to identifying the account-control entity and causing appropriate relief. In individual files, lender or program personnel told borrowers that the first payment might come due before the panels were connected, that a loan could not be canceled, that the installer had already been paid, that the borrower should keep working with the installer or a remediation contractor, or that the file was closed even though no work had been done, the system was not active, or the installer was not responding.

219.    Those practices were deceptive because they misrepresented, obscured, or materially distorted consumers' rights, obligations, defenses, and remedies in seller-arranged financing transactions, including rights arising from fraud, failure of consideration, cancellation, rescission, disputed signatures, the FTC Holder Rule, lender program documents, and the Finance Defendants' own complaint, refund, chargeback, remediation, and account-relief obligations.

220.    Those practices were unfair because they shifted the risk of seller fraud, nonperformance, abandonment, and defective completion from the seller and lender-controlled program to consumers; trapped consumers in long-term debt for failed or disputed projects; and exposed consumers to collection activity, delinquency, adverse credit consequences, and payment demands for systems that did not perform as represented or were never lawfully completed.

221.    Consumers could not reasonably avoid those injuries after origination and funding because the Finance Defendants, depending on their role, controlled or

possessed the servicing, payment-processing, account-status, dispute-handling, chargeback, credit-reporting, assignment, enforcement, and program records necessary to protect consumers or cause relief. Consumers lacked access to lender-side documents, funding certifications, milestone submissions, dealer communications, assignment records, and program controls necessary to protect themselves.

222.   Those practices were abusive because the Finance Defendants took unreasonable advantage of consumers' lack of understanding regarding seller-arranged financing and preserved defenses, and of consumers' inability to protect their interests once Climax failed, disappeared, entered bankruptcy, or stopped responding.

## COUNT IV
### Michigan Consumer Protection Act - Seller-Side Deception, Credit Confusion, HSSA Predicate Violations, and Cancellation-Right Misconduct
### MCL 445.901 et seq., including the MCPA provisions identified below
### (Against Orbit Marketing, LLC d/b/a Climax Solar and Joshua Thompson)

223.   Defendants were provided a Notice of Intended Action not less than 10 days before the commencement of this action as required by Mich. Comp. Laws § 445.905(2).

224.   Climax engaged in trade or commerce in Michigan, and Thompson personally directed, controlled, authorized, participated in, knew of, ratified, or recklessly disregarded Climax's unfair, unconscionable, and deceptive methods, acts, and practices.

67

225.    Climax and Thompson violated the MCPA, including but not limited to the following provisions:

a.    False benefit, quality, approval, and performance claims. Climax and Thompson violated MCL 445.903(1)(a), (c), (e), (g), (m), (n), (y), (bb), and (cc) by causing confusion about utility approval, lender approval, dealer approval, warranty backing, PTO, interconnection, legal rights, obligations, and remedies; representing that solar would eliminate or nearly eliminate electric bills; treating offset percentages as bill savings; presenting tax credits as automatic money back; representing systems as turnkey, code-compliant, properly permitted, and reliably supported; making oral promises materially inconsistent with the written documents; and making positive statements about savings, affordability, completion, warranties, and operation while failing to reveal facts that made those statements misleading.

b.    Credit, payment, and affordability confusion. Climax and Thompson violated MCL 445.903(1)(n), (o), (s), (bb), and (cc) by causing confusion about legal rights, obligations, remedies, and credit terms; presenting long-term financing as a simple bill swap; obscuring finance-driven price inflation, dealer-fee effects, re-amortization risks, payment increases, tax-credit contingencies, and the real cost of credit; and failing to reveal facts material to consumers' ability to understand the financial risk of the transaction.

c.    Prompt-performance and completion misconduct. Climax and Thompson violated MCL 445.903(1)(e), (g), (q), (s), and (bb) by representing that

68

services would be performed promptly, competently, lawfully, and within a reasonable time when they knew or had reason to know that delays, redesigns, permitting failures, inspection failures, utility interconnection problems, backlog, nonresponsiveness, and lack of PTO were likely or recurring.

d. Cancellation, restoration, HSSA, and document misconduct. Climax and Thompson violated MCL 445.903(1)(n), (u), (v), (bb), (cc), and (gg) by violating the HSSA in connection with home-solicitation sales; confusing consumers about cancellation, rescission, restoration, warranty, noncompletion, security-interest, financing, and account remedies; failing to restore payments, cancel security interests, return or cancel evidence of indebtedness, or unwind transaction consequences after cancellation, attempted cancellation, rescission, noncompletion, or failure of consideration; using signature, acknowledgment, completion, or authorization documents consumers did not meaningfully review, understand, or authorize; and using early installation, milestone funding, and termination-fee language in a manner that made cancellation rights confusing, practically punitive, or materially less meaningful.

e. Rushed signing and vulnerable-consumer misconduct. Climax and Thompson violated MCL 445.903(1)(x), (bb), and (cc) by taking advantage of consumers' inability to protect their interests because of age, disability, limited digital literacy, lack of solar knowledge, limited tax knowledge, or reliance on Climax's claimed expertise, and by using same-visit in-home closing, management

69

turn calls, salesperson-controlled electronic signing, and pressure to decide immediately.

f.      Failure to deliver the promised bargain. Climax and Thompson violated MCL 445.903(1)(y), (bb), and (cc) by creating a gross discrepancy between the oral sales pitch and the written agreement, and by failing to provide promised benefits including bill elimination, utility savings, tax-credit treatment, rebates, prompt completion, PTO, warranties, and working systems.

**COUNT V**
**Fraudulent Inducement, Misrepresentation, and Fraudulent Omission**
**Michigan Common Law**
**(Against Orbit Marketing, LLC d/b/a Climax Solar and Joshua Thompson)**

226.    Through Climax's standardized in-home sales pitch, proposal process, financing workflow, contracting process, and post-sale communications, Climax and Thompson made, directed, authorized, or ratified material misrepresentations and omissions concerning electric-bill elimination or reduction, offset percentages, projected savings, utility-rate assumptions, tax-credit treatment, fixed or affordable payments, prompt completion, PTO, system operation, rebates, warranties, cancellation rights, and financing costs.

227.    The representative consumer examples above provide transaction-level illustrations of the who, what, when, where, and how of the scheme. They show consumers were told that solar would eliminate or materially reduce bills, that tax credits or rebates would make the transaction affordable, that payments would remain manageable, that installation and operation would be timely, and that

Climax would provide turnkey service - when those representations were false or misleading in light of Climax's actual practices and known risks.

228.   Climax and Thompson knew, or acted with reckless disregard as to whether, those statements and omissions were false or misleading because the sales model depended on assumptions that were uncertain, unverified, contradicted by written disclaimers, or undermined by known operational failures, PTO delays, project backlogs, complaints, and finance-driven pricing.

229.   Climax and Thompson also had a duty to disclose omitted facts because they made partial and positive representations about savings, tax credits, production, payment stability, completion, PTO, warranties, rebates, and financing costs; possessed superior knowledge of the limitations, contingencies, hidden pricing, and recurring operational failures; and knew consumers were relying on Climax's claimed expertise in a technical transaction.

230.   Climax and Thompson intended that consumers rely on those statements and omissions to sign solar contracts, accept seller-arranged financing, allow installation to proceed, and continue dealing with Climax and the finance companies rather than canceling or seeking independent advice.

231.   Consumers reasonably relied on those misrepresentations and omissions in light of Climax's claimed expertise, the salesperson-controlled in-home process, the technical nature of solar and utility billing, the apparent precision of proposal outputs, and Climax's role in arranging financing.

71

232.    Consumers suffered damages and equitable injury, including long-term debt, continued utility charges, payment increases, loss of the benefit of the bargain, non-operational or underperforming systems, property damage, credit consequences, and loss of cancellation or remediation opportunities.

**COUNT VI**
**Unjust Enrichment**
**Pled in the Alternative**
**(Against All Defendants)**

233.    Defendants received and retained benefits traceable to the challenged Climax-originated transactions, including funded project proceeds, dealer-fee-driven price inflation, platform fees, interest, servicing value, account value, payment streams, rebates, chargeback recoveries, and other transaction benefits.

234.    Those benefits were obtained or retained through, or as a result of, deceptive inducement, misleading cost-of-credit practices, hidden finance-driven price inflation, noncompliant home-solicitation sales, premature or false funding submissions, nonperformance, failure of consideration, and post-notice collection or enforcement.

235.    It would be inequitable for Defendants to retain those benefits to the extent the underlying transactions were induced by deception, subject to cancellation or rescission, unsupported by performance, affected by formation defects, or maintained through unfair, deceptive, or abusive servicing and collection practices.

72

236. This count is pleaded in the alternative to the extent no valid, enforceable, and adequate contract governs the specific benefit retained by a particular Defendant, or to the extent the relevant contracts are void, voidable, rescinded, cancellable, unenforceable, or inadequate to remedy the public harm alleged here. Plaintiff seeks unjust-enrichment relief only from Defendants that actually received or retained a benefit traceable to the challenged transactions, including account value, payment streams, fees, servicing value, assignment proceeds, chargeback recoveries, or similar benefits after notice of the underlying defects.

## COUNT VII
### Declaratory Judgment and Ancillary Injunctive Relief Regarding Preserved Claims and Defenses
### 28 U.S.C. Sections 2201-2202 and the Court's Equitable Authority
### (Against the Finance Defendants)

237. An actual controversy exists regarding whether and to what extent each Finance Defendant may continue to service, collect, report, assign, enforce, or otherwise treat as valid obligations arising from Climax-originated transactions affected by fraud, HSSA violations, cancellation rights, disputed signatures, noncompletion, lack of PTO, material nonperformance, failure of consideration, hidden finance-driven price inflation, or other defects, and whether each Finance Defendant must exercise available contractual or account-control authority to stop those continuing consequences.

238. The controversy is immediate and concrete as to each Finance Defendant to the extent that Defendant currently owns, holds, services, collects,

73

reports, assigns, enforces, directs, controls, or has contractual authority to cancel, suspend, repurchase, charge back, correct, release, remediate, or otherwise affect an affected obligation. Affected consumers continue to face payment demands, collection risk, credit-reporting consequences, lien or security-interest consequences, and uncertainty regarding their rights and defenses.

239.    Plaintiff seeks a declaration that any Finance Defendant with present account-control or remedial authority may not treat seller-arranged financing obligations as insulated from seller misconduct, formation defects, HSSA cancellation rights, preserved claims and defenses, failure of consideration, lack of PTO, or material nonperformance.

240.    Plaintiff further seeks a declaration that, where account-level review establishes fraud, HSSA noncompliance, extended cancellation rights, cancellation, rescission, disputed formation, noncompletion, lack of PTO, material nonperformance, false or premature funding documentation, hidden finance-driven price inflation, or related defects, any Finance Defendant with ownership, servicing, contractual, repurchase, indemnity, chargeback, trustee-direction, account-correction, credit-reporting, lien-release, or remediation authority must provide or cause appropriate relief, including account cancellation, suspension, reduction, refund, credit, correction, lien or UCC release, credit-reporting correction, or other remedy necessary to prevent continued consumer injury.

241.    Plaintiff seeks injunctive relief requiring the Finance Defendants, to the extent of their present or available authority, to halt collection and enforcement;

suspend or correct account status; release liens or security interests where appropriate; correct credit reporting; preserve loan-level documentation; perform account-level review; notify consumers of available relief; exercise available repurchase, chargeback, indemnity, trustee-direction, account-correction, lien-release, credit-reporting, and remediation rights; and cease assigning, selling, transferring, or enforcing affected obligations without adequate safeguards.

242.    To the extent a Finance Defendant no longer controls an affected obligation, Plaintiff seeks preservation and production of records and an order requiring that Defendant to exercise any remaining contractual, repurchase, indemnity, chargeback, trustee-direction, assignment, account-correction, credit-reporting, lien-release, or remediation rights within its possession, custody, control, or legal authority.

243.    Plaintiff also seeks such further declaratory, injunctive, restitutionary, rescissionary, and equitable relief as the Court deems just and proper.

## XIV. RELIEF REQUESTED

WHEREFORE, Plaintiff requests that the Court enter judgment in its favor and grant the following relief:

A.    Declare that Defendants violated the CFPA, the MCPA, including MCPA violations predicated on HSSA noncompliance, Michigan common law, and other applicable law as alleged in this Complaint;

B.    Enter permanent injunctive relief prohibiting Defendants from engaging in the unlawful acts and practices alleged in this Complaint;

C.   Order Climax and Thompson to cease deceptive solar sales, misleading savings claims, misleading tax-credit claims, noncompliant home-solicitation practices, premature completion submissions, and any similar conduct in Michigan;

D.   Order the Finance Defendants to cease unlawful origination, servicing, collection, reporting, dispute-handling, assignment, and enforcement practices connected to affected Climax-originated obligations;

E.   Award restitutionary and rescissionary relief sufficient to restore affected Michigan consumers, as nearly as practicable, to the status quo ante, including cancellation, unwinding, reduction, or reformation of affected obligations where appropriate;

F.   Order refunds, credits, account correction, credit-reporting correction, release of liens or security interests where appropriate, and correction or deletion of adverse account information where appropriate;

G.   Require meaningful account-level review and appropriate relief for affected consumers, including cancellation, reformation, reduction, refund, credit, credit-reporting correction, lien or security-interest release, and other account relief where warranted by the evidence and law;

H.   Award disgorgement, restitution, unjust-enrichment relief, constructive trust, and any other equitable relief necessary to prevent Defendants from retaining benefits wrongfully obtained or retained;

I.   Award civil fines, civil money penalties, costs, fees, and investigative costs where authorized by law;

J.   Order preservation of records necessary to administer relief, including loan files, funding packages, dealer agreements, funding certifications, complaint logs, credit-reporting data, assignment records, PTO records, payment histories, and account-ownership records;

K.   Order Defendants, as necessary to administer relief, to identify and provide account-ownership, servicing, assignment, lien, security-interest, credit-reporting, and account-control information within their possession, custody, or control;

76

L.   Order each Finance Defendant to provide, or exercise all available contractual, servicing, repurchase, indemnity, chargeback, trustee-direction, assignment, account-correction, credit-reporting, lien-release, and remediation rights to cause, appropriate relief for affected consumers; and

M.   Grant such other and further relief as the Court deems just and proper.

## XV.   JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

*/s/ Jeffrey D. Mapes* (P70509)
Jeffrey D. Mapes (P70509)
Jacob M. Satin (P80149)
Assistant Attorneys General
Attorney for Plaintiff
Corporate Oversight Division
PO Box 30736
Lansing, MI 48909
(517) 335-7632
MapesJ1@michigan.gov
SatinJ1@michigan.gov

Dated:  July 15, 2026